## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARTIN Z. GAVIN<br>                    Plaintiff,<br><br>vs.<br><br>MEDTRONIC, INC.; MEDTRONIC USA, INC.;<br>AND MEDTRONIC SOFAMOR DANEK USA,<br>INC.<br>                    Defendants. | CIVIL ACTION NO.<br><br>SECTION<br><br>DIVISION<br><br>COMPLAINT AND DEMAND<br> FOR JURY TRIAL |

### COMPLAINT

Plaintiff, MARTIN Z. GAVIN, residing in Orleans Parish within the State of Louisiana, by and through the undersigned attorneys, and for his causes of action alleges against Defendants, MEDTRONIC, INC., MEDTRONIC USA, INC., AND MEDTRONIC SOFAMOR DANEK USA, INC. (collectively "Defendants"), all on information and belief as follows:

### NATURE OF THE ACTION

1.      This is a products liability action arising out of personal injuries caused by the illegal off-label promotion by a medical device manufacturer.  Plaintiff, Martin Z. Gavin, underwent a spinal Transforaminal Lumbar Interbody Fusion ("TLIF") surgery to cure his chronic back pain, in which his surgeon used a mixture of Plaintiff's own bone fragments and INFUSE Bone Graft manufactured by Defendants. INFUSE Bone Graft is a surgically implanted medical device containing a genetically engineered protein designed to stimulate bone growth.

2.      The FDA has only approved INFUSE Bone Graft for a single spinal fusion surgical procedure - Anterior Lumbar Interbody Fusion ("ALIF"). Yet, Defendants illegally promoted the device for a number of off-label procedures, including but not limited to the TLIF procedure Plaintiff underwent.

3.      Plaintiff's spinal fusion surgery, which was expected to cure and remedy his chronic back pain, was unsuccessful. As a result of the surgery utilizing the untested, unapproved and off-label use of INFUSE Bone Graft, Plaintiff's condition and pain have worsened necessitating an additional surgery for placement of a transcutaneous electrical nerve stimulation ("TENS") unit to help lessen his pain.

4.      In July of 2011, *The Spine Journal* dedicated the entire journal to articles regarding the risks associated with INFUSE Bone Graft in unapproved procedures. The various articles discuss, among other things,  Defendants' failure to accurately report the side effects from its initial clinical trials; Defendants' failure to report that many of the physicians and authors who studied and promoted INFUSE Bone Graft had significant financial ties to Defendants; that INFUSE Bone Graft can cause severe problems to nerves and spinal cords; and that off-label use of INFUSE Bone Graft can lead to severe adverse side effects.

5.      As a result of Defendants' illegal off-label marketing and promotion of INFUSE Bone Graft and failure to honestly disclose the risks associated with off-label use to the medical community and patients, Plaintiff has endured permanent physical and emotional pain and will no longer be able  to live a normal and pain-free life.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because complete diversity exists between the parties as all Defendants are incorporated and have their principal places

2

of business in states other than the state in which the named Plaintiff resides. This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Eastern District of Louisiana.

### PLAINTIFF

8.      Plaintiff, Martin Z. Gavin, is a natural person and a resident of New Orleans, Louisiana.

9.      Plaintiff, Martin Z. Gavin, was injured as a result of Defendants' illegal off-label promotion of INFUSE Bone Graft. Plaintiff currently has and will continue to have difficulty doing the most basic tasks of everyday living. Plaintiff will require additional surgeries and treatment in the future. Plaintiff's daily life is consumed with and devastated by the prospects of a life of pain and medication, and therefore seeks damages for pain and suffering, ascertainable economic losses, attorneys' fees, reimbursement of costs of all surgeries related to INFUSE Bone Graft, and reimbursement for all past, present and future health and medical care costs related to Defendants' illegal promotion of INFUSE Bone Graft.

### DEFENDANTS

Made Defendants herein are the following parties:

10.      MEDTRONIC INC., is a Minnesota corporation which has its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota, 55432. Upon information and belief, MEDTRONIC INC. is involved in the research, development, manufacturing, sale, promotion and marketing of INFUSE Bone Graft and has conducted business within the State of Louisiana from

which it has derived substantial revenue from products, including INFUSE Bone Graft, used in the State of Louisiana.

11.     MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation which has its principal place of business at 2600 Sofamor Danek Drive, Memphis, Tennessee, 38132. Upon information and belief MEDTRONIC SOFAMOR DANEK USA, INC. is a wholly-owned subsidiary of MEDTRONIC INC. and has conducted business within the State of Louisiana from which it has derived substantial revenue from its products, including INFUSE Bone Graft, used in the State of Louisiana.

12.     MEDTRONIC USA, INC. is a Minnesota corporation which has its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota, 55432. Upon information and belief, MEDTRONIC USA, INC. is a wholly-owned subsidiary of MEDTRONIC INC. and has conducted business within the State of Louisiana from which it has derived substantial revenue from its products, including INFUSE Bone Graft, used in the State of Louisiana.

13.     Upon information and belief, at all relevant times, Defendants were engaged in the business of researching, developing, designing, manufacturing, distributing, marketing, selling, promoting, and/or introducing into interstate commerce and into the State of Louisiana, either directly or indirectly through third parties or related entities, its products, including INFUSE Bone Graft.

14.     At all relevant times, Defendants conducted regular and sustained business and engaged in substantial commerce and business activity in the State of Louisiana, which included but was not limited to marketing, selling and promoting INFUSE Bone Graft in Louisiana.

4

15.     Upon information and belief, Defendants expected or should have expected that their acts would have consequences within the United States of America, including the State of Louisiana, and Defendants derived and derive substantial revenue through interstate commerce.

16.     Upon information and belief, and as a result of the defective nature of INFUSE Bone Graft, Defendants committed tortious acts within the State of Louisiana causing injury to persons who were implanted with the defective medical device, including Plaintiff.

17.     Upon information and belief, Defendants illegally promoted the off-label use the defective medical device INFUSE Bone Graft, concealed and continue to conceal their knowledge of INFUSE Bone Graft's unreasonably dangerous risks and side effects from Plaintiff, other patients, and the medical community, including but not limited to an increased risk of developing cancer, bone overgrowth, nerve damage, and death  associated with off-label use of INFUSE Bone Graft in spinal surgeries.

### FACTUAL ALLEGATIONS

**A.    SPINAL FUSION SURGERY**

18.     Spinal fusion surgery joins vertebrae together to eliminate or reduce movement between vertebrae through the use of bone grafts. This surgery is used to treat a number of conditions, including treatment of a fractured vertebra, spine deformities, abnormal or excessive movement between vertebrae, and back pain. The goal of spinal fusion is to obtain a solid fusion of the vertebrae and eliminate the pain caused by the condition being treated.

19.     Bone graft procedures consist of placing the graft - usually bone or bonelike material - around the vertebrae during the surgery. Over the following months, a physiological mechanism,

similar to that which occurs when a fractured bone heals, causes the graft to join or "fuse," the vertebrae together.

20.      In an autologous bone graft ("autograft"), the surgeon procures bone graft material from another part of the patient's body and implants the bone graft in the site where fusion is desired. Successful fusions using the harvested bone occur at significantly higher rates in autograft procedures as the bone exhibits all the properties necessary for bone growth, including osteogenic, osteoconductive and osteoinductive properties. With that said, autografts require additional surgery to extract the bone material, which comes with increased costs and patient risks, and patients often endure pain at the harvest site.

21.      As an alternative to autograft, patients can opt for an allograft procedure, in which bone is extracted from cadavers of deceased people who have donated their bone. Although an allograft eliminates the harvest procedure, as well as the pain and patient risk, it is less likely to result in a successful spinal fusion and presents a new risk that the patient will suffer a negative immune response and reject the graft.

22.      Consequently, studies revealing the ability for biologically manufactured protein to generate bone growth in laboratory animals presented a third surgical alternative to traditional bone graft procedures. Thus, if fusion could be accomplished through the use of the biologically manufactured proteins, patients could forego the harvest surgery required in an autograft, but could still benefit from the superior fusion rates associated with that procedure.

**B.      MEDTRONIC, INC. BACKGROUND**

23.      Sofamor Danek Group, Inc., a Tennessee-based spinal device maker, acquired the exclusive rights to recombinant human bone morphogenetic protein-2 ("rhBMP-2") for spinal fusion

applications in February 1995. rhBMP-2 is a genetically engineered version of a naturally occurring protein that stimulates bone growth.

24.     In October 1996, Sofamor Danek Group, Inc. filed an application for an Investigational Device Exemption with the FDA to conduct a pilot study on the effects of rhBMP-2 in humans - the first step to obtaining approval to commercially market bone morphogenetic protein ("BMP").

25.     Medtronic is a manufacturer of medical devices and prides itself as a "global leader in medical technology." Medtronic is divided into seven operating segments: Spinal, Cardiac Rhythm Disease Management, CardioVacular, Neurmodulation, Diabetes, Surgical Technologies, and Physio-Control.

26.     Medtronic's spinal segment is a material component of its operations,  currently comprises 21% of its total business revenue, and is responsible for over one-fifth of its overall net sales.

C.     **FDA MEDICAL DEVICE APPROVAL REQUIREMENTS AND LIMITED USE APPROVAL OF INFUSE BONE GRAFT**

27.     The current regulatory framework for medical device approval, established in the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act of 1938, contains a three-class classification system for medical devices: Class I devices pose the lowest risk and do not require FDA marketing approval; Class II devices pose an intermediate risk and could include post-market surveillance; and Class III devices pose the greatest risk of complications or death. INFUSE Bone Graft is a Class III device.

28.     Class III devices require manufacturers to submit a Premarket Approval Application ("PMA"), which is evaluated and approved by the FDA, and must include the intended uses of the medical device and copies of all proposed labeling. The PMA also requires the manufacturer to demonstrate the device's safety and efficacy through an exhaustive process that analyzes clinical, other non-clinical laboratory studies, and clinical investigations.

29.     The indications for use required for labeling are based on the non-clinical studies and clinical investigations included in the PMA. Indications for use for a medical device must include a general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for which the device is intended. Approval of the device's labeling is conditioned on the applicant incorporating any labeling changes exactly as directed by the FDA, and a copy of the final printed labeling must be submitted to the FDA before marketing.

30.     Sofamor Danek Group, Inc. used the results from an October 1996 pilot study to petition the FDA to initiate a trial of rhBMP-2 with the LT-CAGE. This trial, which was approved in July of 1998, involved 135 investigational patients who had rhBMP-2 implanted in a single-level anterior procedure and 135 control patients who underwent the same procedure except that autologous bone graft was used in place of rhBMP-2.

31.     In1999, Medtronic purchased Sofamor Danek Group, Inc. for $3.6 billion. After the acquisition, Medtronic filed the INFUSE Bone Graft PMA on January 12, 2001, and was granted expedited review by the FDA.

32.     On July 2, 2002, the FDA approved INFUSE Bone Graft, a medical device containing an absorbable collagen sponge that is treated with rhBMP-2, solely for the treatment of degenerative

discs in the lower lumbar region of the spine through a specified spinal fusion procedure - Anterior Lumbar Interbody Fusion ("ALIF"); fractures of the tibia; and certain facial/oral surgeries.

33.    INFUSE Bone Graft, as presented in Medtronic's original PMA, consisted of two components; (1) the LT-CAGE ® Lumbar Tapered Fusion Device Component, a thimble-sized metal cylinder which keeps the two vertebrae in placed and provides the frame that contains the BMP; and (2) the INFUSE Bone Graft Component, which includes an absorbable collagen sponge that acts as a carrier for the active ingredient in INFUSE Bone Graft, and the rhBMP-2.

34.    Additionally, and according to the label sought by Medtronic in the PMA, INFUSE Bone Graft could only be used in an ALIF procedure, which is performed by approaching the spine from the front through an incision in the abdomen and is primarily used to treat pain resulting from disc collapse.

35.    Upon information and belief, Plaintiff alleges there are at least three other lumbar spine surgical procedures for which INFUSE Bone Graft had not been approved but for which it was promoted and/or utilized. The other lumbar procedures include: (a) Posterior Lumbar Interbody Fusion ("PLIF"), a procedure that is used to treat nerve compression and back pain, involves approaching the spine from the back; (b) Posterolateral Fusion which is similar to the PLIF procedure, but instead of removing disc space and replacing it with a bone graft, the disc space remains intact and the bone graft is placed between the transverse processes in the back of the spine; and (c) Transforaminal Lumbar Interbody Fusion, which is also similar to the PLIF procedure, and is utilized when an inter-body fusion is performed via a posterior approach.

36.    Upon information and belief, INFUSE Bone Graft with the LT-CAGE ALIF single-level fusion was the only procedure and indication used in the study that formed the basis of

9

Medtronic's PMA submission, because the use of rhBMP-2 in other procedures revealed instances of adverse events. For example, a Medtronic-sponsored trial examining the application of rhBMP-2 using the PLIF procedure was halted in December 1999 when heterotopic bone growth - defined as any bone growth that occurs in areas of the body where such growth is not desired - developed in a number of patients. A doctor who participated in the study reported that one of the patients he treated required two extra surgeries to clear the excessive bone growth from the spinal canal. The complications observed in the PLIF trial were particularly serious given the potential of neural impingement from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure attempts to eliminate; the very type of pain that Plaintiff continues to suffer.

37.    Complications such as those noted in the PLIF trial result from INFUSE Bone Graft's very mechanism of action. In such cases, INFUSE Bone Graft can stimulate bone growth where new bone is not desired and can lead to excessive bone growth and swelling of the target area. There is insufficient scientific evidence concerning the proper dosages of rhBMP-2 for use in the different procedures or the expected responses to the protein in different biological environments. In fact, many adverse events associated with the use of INFUSE Bone Graft result from off-label use of the product by medical professionals who do not fully understand the nature of this protein nor the proper application for use.

38.    Upon information and belief, at the FDA Advisory Committee panel hearing on January 10, 2002 concerning FDA approval of Defendants' INFUSE Bone Graft, the panel members stressed concerns over the potential off-label use of the product and asked Defendants repeated questions about how the company would seek to guard against off-label applications of the device.

39.     At the conclusion of the hearing, the FDA Advisory Panel again reiterated concerns over the potential for off-label use, specifically admonishing Defendants to guard against procedures other than the specific ALIF procedure as provided in the labeled application.

40.     Upon information and belief, at the time of  FDA approval, Defendants were well aware of the concerns regarding off-label uses of INFUSE Bone Graft and the potential adverse and dangerous risks associated with same.

41.     Subsequent medical studies confirmed the concerns of the FDA Advisory Panel that off-label use of INFUSE Bone Graft could present severe and deadly risks to patients. And, although those adverse side effects were reported in medical journals and other sources known to Defendants, the dangers posed by the increasing off-label use of INFUSE Bone Graft and the impact on the sustainability of the valuable revenue stream generated by the off-label sales were deliberately concealed by Defendants from the medical community, including Plaintiff's surgeon.

42.     Indeed, numerous medical studies published since Defendants first introduced INFUSE Bone Graft have shown that its use in procedures not approved by the FDA can lead to potentially serious, and even deadly, adverse events. As the authors stated in a May 15, 2006 medical article in *Spine* entitled "Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue," rhBMP-2 "may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces...Although this phenomenon has not been thoroughly studies, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction." Such swelling is particularly problematic considering that INFUSE Bone Graft is primarily used in the spine.

43.     Upon information and belief, Plaintiff alleges that a number of other published articles and studies likewise noted the serious risks posed by off-label use of INFUSE Bone Graft prior to its use in Plaintiff's TLIF procedure.

**D.     MEDTRONIC ILLEGALLY PROMOTED INFUSE BONE GRAFT FOR OFF-LABEL USES**

44.     Upon information and belief, Plaintiff alleges that despite the reports and the FDA Advisory Panel's concerns, as set forth herein, Defendants concealed it's surreptitious effort to promote the widespread off-label use of INFUSE Bone Graft. Defendants provided millions of dollars in undisclosed payments to doctors (including so-called "Key Opinion Leaders") who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements addressing off-label use of INFUSE Bone Graft. In turn, Defendants' sales force would direct other doctors to these consultants and Key Opinion Leaders or their written work to further drive off-label sales of the INFUSE Bone Graft.

45.     According to the FDCA and FDA regulations, medical device and drug manufacturers such as Defendants cannot promote products for uses not approved by the FDA. Indeed, federal law provides for significant penalties for manufacturers that promote their products in ways inconsistent with a product's labeling. Penalties for off-label promotion were created to ensure that the FDA's careful and deliberate consideration of a product's suitability for public consumption is not undermined by manufacturers seeking to circumvent the PMA process.

46.     Any application of INFUSE Bone Graft outside of its FDA approved usage is considered off-label. Examples of off-label uses include: when the rhBMP-2 is applied without using the LT-CAGE or with a substitute cage; use of INFUSE Bone Graft in a PLIF,  TLIF or any other

procedure besides an ALIF procedure  using the LT-CAGE; or use of INFUSE Bone Graft in an ALIF procedure that involved a multiple-level fusion.

47.     Despite the FDA's prohibition against off-label promotion, Defendants actively promoted off-label use of INFUSE Bone Graft by, among other things, providing doctors with information about other doctors using the device off-label (including those Key Opinion Leaders and paid consultants) and by having Defendants' sales force present in the operating rooms at the time of the off-label surgeries to provide doctors with information and instruction during those surgeries.

48.     Upon information and belief, Plaintiff alleges that as a result of Defendants' illegal off-label promotion, sales of INFUSE Bone Graft soared over the years and have totaled billions of dollars. Indeed, INFUSE Bone Graft sales for 2010 alone exceeded $900 million.

49.     The medical community is finally beginning to learn of the serious risks associated with off-label use of INFUSE Bone Graft. In July of 2011, one of the leading journals on spine surgery, *The Spine Journal*, dedicated its entire journal to publishing various articles concerning the risks associated with off-label use of INFUSE Bone Graft, including articles on Defendants' failure to accurately report the side effects from its clinical trials; Defendants' failure to report that many of the authors who studied and promoted INFUSE Bone Graft had major financial ties to Medtronic with the median range of $12 to $16 million per study; INFUSE Bone Graft causing severe problems with nerves and spinal cords; off-label use of INFUSE Bone Graft causing severe and debilitating side effects, including death; and how Defendants and its paid consultants downplayed the risks associated with off-label use of INFUSE Bone Graft and over-emphasized its benefits.

50.     At all relevant times, Defendants manufactured, promoted, and sold INFUSE Bone Graft for use in off-label applications.

13

51.     As a result of Defendants' actions, Plaintiff was injured due to the unapproved off-label use of INFUSE Bone Graft in his TLIF surgery, which caused and will continue to cause Plaintiff various injuries and damages, including but not limited to suffering extreme and debilitating pain necessitating the implantation of a TENS unit and an increased risk of developing cancer. Plaintiff accordingly seeks damages associated with these injuries.

52.     As the manufacturers of INFUSE Bone Graft, Defendants knew or should have known that off-label use was associated with increased risks of developing cancer, bone overgrowth, nerve damage, respiratory depression and death in addition to being prohibited by the FDA . Instead, Defendants illegally promoted the off-label use of INFUSE Bone Graft as a safe and effective spinal fusion procedure.

53.     As a proximate result of Defendants' conduct, Plaintiff's surgeon used INFUSE Bone Graft in this TLIF procedure - a procedure not approved by the FDA for INFUSE Bone Graft application.

54.     The injuries and damages sustained by Plaintiff were a direct and proximate result of Defendants' illegal promotion of INFUSE Bone Graft.

55.     Had Plaintiff been adequately warned of the potential life-threatening side effects of Defendants' defective medical device, Plaintiff would have chosen other treatments or spinal fusion procedures to correct his condition and resulting back pain.

E.     **MARTIN Z. GAVIN'S TLIF SURGERY**

56.     Plaintiff's surgeon diagnosed him with "L4-L5 grade 1 degenerative spondylolisthesis." On February 7, 2011, Plaintiff's surgeon performed a surgical procedure known as Transforaminal Lumbar Interbody Fusion which is a procedure utilized to fuse the fourth and fifth

14

lumbar vertebral body to create a solid bone between the adjoining vertebrae. During this procedure, a complete discectomy at L4-L5 was done and replaced with a mixture of autograft and INFUSE Bone Graft with the intention that it would stimulate bone growth over time in order to fuse the vertebrae together.

57.     However, Plaintiff's surgeon used the INFUSE Bone Graft in an off-label application. Instead of performing an anterior procedure, his surgeon opted for a posterior procedure. The FDA had not approved Defendants' INFUSE Bone Graft to be used in a posterior spinal fusion procedure.

58.     Upon information and belief, Plaintiff alleges that Defendants, through its sales representatives and paid consultants directly and indirectly promoted, trained and encouraged Plaintiff's surgeon to use INFUSE Bone Graft in an off-label manner, including utilizing it in posterior approach spinal fusions.

59.     Plaintiff, among other things, was never informed that the spinal fusion would involve using the INFUSE Bone Graft; never informed that this device had only received limited FDA approval for certain procedures; never informed that the INFUSE Bone Graft in a posterior procedure had not been tested or approved by the FDA; never informed that a INFUSE Bone Graft clinical trial utilizing the posterior approach had been halted due to serious adverse events; never informed that the use of INFUSE Bone Graft could result in unwanted bone growth or migration of the bone to sensitive nerve areas exacerbating his pain; never informed that INFUSE Bone Graft could cause severe, debilitating, and permanent lower back pain; and never informed of available alternative methods of surgery.

60.     Plaintiff has never recovered from the surgery, has seen three physical therapists/pain management specialists, endured numerous painful and unsuccessful epidural spinal injections, and

will undergo surgery for the implantation of a TENS unit to help "ease" his debilitating, and now permanent pain.

61.    At all relevant times, Plaintiff was led to believe that his on-going and escalating back pain was caused by his underlying medical condition. It was not until January 2012 that Plaintiff first learned that INFUSE Bone Graft was not FDA approved for use in his posterior spinal fusion procedure and further learned that this defective medical device was associated with unwanted bone growth, nerve impingement, cancer, death and other severe adverse side effects. It was at this point that Plaintiff first discovered that his post-February 2011 back pain was caused by Defendants illegal promotion of INFUSE Bone Graft in his TLIF procedure.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### INADEQUATE WARNING UNDER LA. R.S. 9:2800.57

62.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

63.    At all relevant times, Defendants were engaged in the business of designing, manufacturing, testing, promoting, marketing, distributing, labeling, and/or selling INFUSE Bone Graft.

64.    INFUSE Bone Graft was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert the medical community and consumers, including Plaintiff herein, of the dangerous risks associated with the off-label use of the subject device, including but not limited to its propensity for permanent physical injuries including, but not limited to, suffering unwanted bone overgrowth, nerve impingement, cancer, death

and other serious injuries and side effects, notwithstanding the Defendants' knowledge of an increased risk of these injuries and side effects and the medical community's propensity for off-label use of the subject device. Thus, the subject product was unreasonably dangerous because an adequate warning was not provided pursuant to La.R.S. 9:2800.57.

65.     The subject device manufactured and promoted by Defendants was also defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of serious bodily harm from the use of the subject device, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the defects of the device, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the device could cause serious injury.

66.     Plaintiff could not have discovered any defect in the subject product through the exercise of reasonable care.

67.     Defendants, as manufacturers and/or distributors of the subject device, are held to the level of knowledge of an expert in the field.

68.     The warnings that were given by the Defendants were not accurate, clear and/or were ambiguous.

69.     The warnings that were given by the Defendants failed to properly warn the medical community and consumers of the increased risks of permanent physical injuries including, but not limited to, unwanted bone growth, nerve impingement, cancer, death and other serious injuries and side effects.

70.     Plaintiff, individually and through his surgeon, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

17

71.     The Defendants had a continuing duty to warn Plaintiff of the dangers associated with the off-label use of INFUSE Bone Graft.

72.     Had Plaintiff received adequate warnings regarding the risks associated with off-label use of INFUSE Bone Graft, he would not have used it.

73.     The Plaintiff has been damaged by the Defendants' failure to warn of all known risks associated with the subject device.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY

74.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

75.     At all relevant times, Defendants were engaged in the business of designing, manufacturing, promoting, marketing, and sale of INFUSE Bone Graft.

76.     At all relevant times, Defendants knew or should have known that off-label use of INFUSE Bone Graft in unapproved procedures, including but not limited to posterior procedures, was unsafe, defective, and unreasonably dangerous.

77.     At all relevant times, Defendants had specific knowledge of the dangerous risks associated with off-label use of INFUSE Bone Graft when used in an unapproved procedure such as the TLIF surgery performed on Plaintiff.

78.     At all relevant times, the medical community, Plaintiff, and Plaintiff's surgeon relied upon Defendants' misrepresentations and utilized INFUSE Bone Graft in an off-label procedure as promoted by Defendants.

18

79.     At all relevant times, the off-label use of INFUSE Bone Graft in a posterior procedure produced dangerous and permanent side effects, including unwanted bone growth, nerve damage, cancer and death, and Defendants knew or should ave know that such off-label use could be unsafe because of said side effects.

80.     Plaintiff's surgeon used INFUSE Bone Graft in an unapproved procedure that was a result of Defendants' intentional and illegal promotion of such off-label use.

81.     Defendants promoted the off-label use of INFUSE Bone Graft with the knowledge of the severe risks to patients associated with off-label use.

82.     The off-label use of INFUSE Bone Graft, as used in Plaintiff's TLIF procedure, was unsafe, defective, and unreasonably dangerous when promoted and marketed by Defendants, who are strictly liable for the injuries arising from such use.

83.     The off-label use of INFUSE Bone Graft, as promoted by Defendants, failed to perform in a manner that a reasonable consumer would expect it to perform.

84.     Upon information and belief, Plaintiff alleges that Defendants knew that INFUSE Bone Graft, when used in off-label procedures as promoted by Defendants, was unsafe, defective, and unreasonably dangerous; that Defendants knew that, because such off-label use was dangerous and defective when so used, the product could not be safely used for the purpose intended; and that Defendants conducted themselves in a willful, wanton, and reckless manner.

### THIRD CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY UNDER LA. 9:2800.58

85.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

86.     Defendants expressly represented to Plaintiff, other consumers, and the medical community that INFUSE Bone Graft was safe and fit for its intended purposes, was of merchantable quality, did not produce any dangerous side effects, and had been adequately tested.

87.     INFUSE Bone Graft does not conform to Defendants' express representations because it is not safe, has numerous and serious side effects and causes severe and permanent injuries including, but not limited to,  unwanted bone growth, nerve damage, cancer, death.

88.     At the time of the making of the express warranties, Defendants knew or should have known of the purpose for which INFUSE Bone Graft was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purposes. The subject device was unreasonably dangerous because it failed to conform to an expressed warranty of the Defendants as provided by La.R.S. 9:2800.58.

89.     At the time of the making of the express warranties, Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that INFUSE Bone Graft was not safe and fit for its intended use, as promoted by Defendants, and, in fact, causes serious injuries to the patient including, but not limited to unwanted bone growth, nerve damage, cancer and death.

90.     At all relevant times, INFUSE Bone Graft did not perform as safely as an ordinary consumer would expect when used as intended and promoted or in a reasonably foreseeable manner.

91.     Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

92.     As such, the Plaintiff has been damaged by Defendants' actions.

20

<u>FOURTH CAUSE OF ACTION</u>

**BREACH OF WARRANTY OF FITNESS FOR ORDINARY USE**

93.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

94.    Defendants warrant that INFUSE Bone Graft is reasonably fit for its ordinary and intended use. La. C.C. art. 2524.

95.    INFUSE Bone Graft in off-label procedures, as promoted by Defendants, is not safe, has numerous and serious side effects and causes severe and permanent injuries including, but not limited to  unwanted bone growth, nerve damage, cancer, death and other serious injuries and side effects. As a result, Defendants' product is unfit and inherently dangerous for ordinary use.

96.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained serious and permanent injuries. In addition, Plaintiff required and will continue to require healthcare and medical services as a result. Plaintiff has incurred and will continue to incur medical and related expenses as a result of his injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include hospitalization care, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain as a result of Defendants' illegal promotion of off-label use of INFUSE Bone Graft for use in his posterior spinal fusion surgery.

## FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS

97.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

98.     At all relevant times, Defendants utilized medical journal articles, advertising, sales representatives and paid Key Opinion Leaders to promote the off-label use of INFUSE Bone Graft and impliedly warranted to the medical community, surgeons, and other members of the general public that off-label uses, such as uses in posterior procedures, were safe and effective.

99.     Defendants were aware or, in the exercise of reasonable diligence, should have known that off-label uses of INFUSE Bone Graft had the severe, adverse side effects set forth herein.

100.    Plaintiff, other consumers, and the medical community reasonably relied upon the judgment and sensibility of the Defendants to sell INFUSE Bone Graft only if it was indeed of merchantable quality and safe and fit for its intended use. However, as a means for enhancing sales, Defendants illegally promoted it beyond the legal and limited intended uses for which it had been approved.

101.    Defendants breached the implied warranty to the medical community, consumers, including Plaintiff, and Plaintiff's surgeon, as INFUSE Bone Graft was not of merchantable quality, was not adequately packaged and labeled, and/or was not safe and fit for its promoted off-label uses, including uses in posterior procedures, in that it lead to unwanted bone growth, nerve damage, increased debilitating pain and other dangerous adverse side effects.

102.    Consumers, including Plaintiff and the medical community, reasonably relied upon Defendants' implied warranty for INFUSE Bone Graft.

103.     INFUSE Bone Graft reached consumers, including Plaintiff and the medical community, without substantial change in the condition in which it was manufactured, promoted and sold by Defendants.

104.     Plaintiff has been damaged by Defendants' breach of implied warranty.

### SIXTH CAUSE OF ACTION

#### NEGLIGENCE

105.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

106.     Defendants owed a duty to Plaintiff to exercise reasonable care in the promoting, marketing and/or sale of INFUSE Bone Graft into the stream of commerce, including a duty to advise consumers that known off-label use of INFUSE Bone Graft would cause users to suffer unreasonable, dangerous and permanent adverse effects such as unwanted bone overgrowth, nerve damage, cancer and death.

107.     Defendants  failed to exercise ordinary care in promoting, marketing and/or sale of INFUSE Bone Graft into interstate commerce in that they knew or should have known that using INFUSE Bone Graft in off-label procedures caused a risk of unreasonable, dangerous and permanent adverse effects, including  unwanted bone overgrowth, nerve damage, cancer and death.

108.     Despite the fact that Defendants knew or should have known, based upon the state of knowledge as it existed at the time, that off-label use of INFUSE Bone Graft was associated with those unreasonable, dangerous and permanent adverse effects, they continued to market, promote and sell INFUSE Bone Graft for use in off-label procedures.

109.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to exercise ordinary care, as set forth above.

110.    A proximate cause of Plaintiff's injuries and damages is the negligence and misrepresentations of Defendants through its agents, sales representatives, paid Key Opinion Leaders, and employees acting within the course and scope of their employment, in negligently, carelessly and recklessly selling, promoting, labeling, testing, distributing and marketing INFUSE Bone Graft, including, among other things:

(a)    Negligently, carelessly, and recklessly engaging in the illegal off-label promotion of INFUSE Bone Graft by recommending to the medical community, including Plaintiff's surgeon, and instructing them to use it in unapproved procedures;

(b)    Negligently, carelessly, and recklessly failing to disclose that use of INFUSE Bone Graft in posterior procedures had not been approved by the FDA;

(c)    Negligently, carelessly, and recklessly failing to disclose to the medical community that the promoted off-label use of INFUSE Bone Graft can result in severe adverse side effects;

(d)    Negligently, carelessly, and recklessly failing to disclose the results of the testing and other available information in its possession regarding the adverse side effects associated with the off-label use of INFUSE Bone Graft;

24

(e)     Negligently, carelessly, and recklessly representing that the off-label use of INFUSE Bone Graft was safe when, in fact, it was unsafe;

(f)     Negligently, carelessly, and recklessly promoting INFUSE Bone Graft beyond the restricted and limited uses for which it was approved;

(g)     Negligently, carelessly, and recklessly instructing paid Key Opinion Leaders and researchers to downplay and/or omit the results concerning the severe adverse side effects associated with off-label usage of INFUSE Bone Graft; and

(h)     Negligently, carelessly, and recklessly failing to adequately warn the medical community, Plaintiff,  Plaintiff's surgeon, and the general public of the severe adverse side effects from off-label use of INFUSE Bone Graft.

111.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious, dangerous and permanent adverse side effects, including but not limited to debilitating pain, as well as other severe and personal injuries which are permanent and lasting in nature, mental anguish, including loss of enjoyment of life, risk of developing cancer, reasonable fear of developing cancer, as well as the need for lifelong medical treatment, monitoring and/or medications.

112.    As a further result of the foregoing acts and omissions of Defendants, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed, believes, and further alleges that he will in the future be required to obtain further medical and/or hospital care and services.

## SEVENTH CAUSE OF ACTION

### VIOLATIONS OF FEDERAL REGULATIONS

113.    Defendants had an obligation to comply with the law in the manufacture, promotion, and sale of INFUSE Bone Graft.

114.    Upon information and belief, Defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq*.

> (a)    The medical device INFUSE Bone Graft is misbranded pursuant to 21 U.S.C. § 352 because, among other things, its labeling is false or misleading.

> (b)    The medical device INFUSE Bone Graft is misbranded pursuant to 21 U.S.C. § 352 because words, statements, or other information required by or under authority of chapter  21 U.S.C. § 352 are not prominently placed thereon with such conspicuousness and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

> (c)    The medical device INFUSE Bone Graft is misbranded pursuant to 21 U.S.C. § 352 because the labeling does not bear adequate directions for use, and/or the labeling does not bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users.

(d)     The medical device INFUSE Bone Graft does not contain adequate directions for use pursuant to 21 CFR § 801.5 because, among other reasons, of omission, in whole or in part, or incorrect specification of (a) statements of all conditions, purposes, or uses for which such device is intended, including conditions, purposes, or uses for which it is prescribed, recommended, or suggested in its oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the device is commonly used, and (b) the route or method of administration or application.

(e)     The Defendants violated 21 CFR §803.50 by failing to report adverse events associated with the medical device INFUSE Bone Graft as soon as possible or at least within 30 days of the initial receipt by the Defendants of the adverse experience.

(f)     The Defendants violated 21 CFR § 803.56 by failing to promptly investigate all serious, adverse drug experiences and submit follow-up reports within the prescribed 15 calendar days of receipt of new information or as requested by the FDA.

(g)     Defendants violated 21 CFR § 814.39 by failing to submit a PMA supplement while promoting the off-label use of INFUSE Bone Graft which affected the safety and effectiveness of the device.

(h)      Defendants violated 21 CFR § 814.84 by failing to submit periodic reports including all unpublished reports of data from any clinical

investigations or non-clinical laboratory studies involving the device

known to or that reasonably should be known to the applicant.

115.    Defendants failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as the Plaintiff, making Defendants liable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, as follows:

a.    Awarding compensatory damages to Plaintiff in an amount to be determined at trial;

b.    Awarding pre-judgment and post-judgment interest to the Plaintiff;

c.    Awarding the costs and expenses of this litigation to the Plaintiff;

d.    Awarding reasonable attorneys' fees and costs to the Plaintiff as provided by law; and

e.    Granting any and all such other relief as the Court deems necessary, just and proper.

### DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all counts and as to all issues.

**SIGNATURE BLOCK ON NEXT PAGE**

Dated: March 30, 2012

Respectfully Submitted,

BY: */s/ Robin Myers Primeau*

Stephen B. Murray, T.A. (9858)
Arthur M. Murray (27694)
Jessica W. Hayes (28927)
Robin M. Primeau (32613)
**MURRAY LAW FIRM**
Suite 2150 Poydras Center
650 Poydras Street
New Orleans, Louisiana 70130
T:      (504) 525-8100
F:      (504) 584-5242
Email: smurray@murray-lawfirm.com
Email: amurray@murray-lawfirm.com
Email: jhayes@murray-lawfirm.com
Email: rmyers@murray-lawfirm.com

29